IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>KEPA MAUMAU,<br><br>        Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br>Case No. 2:08-CR-758(11)-TC-SA |

      Defendant Kepa Maumau filed a motion to suppress the "Exit Plan" he wrote at the age of 17 before he was released from incarceration at the Wasatch Youth Center by the Youth Parole Authority. (See Docket No. 624.) In his Exit Plan, he details his involvement with the Tongan Crip Gang and makes statements that would be incriminating in this RICO prosecution. In his motion, Mr. Maumau asserted that the Exit Plan was a requirement for release from detention and that it was obtained in violation of his Fifth Amendment right against self-incrimination.

      At the beginning of the August 19, 2011 evidentiary hearing, counsel for Mr. Maumau told the court that the legal issue had changed based on recently acquired information that the Exit Plan was not a requirement for release from detention. After a discussion about the changed circumstances, the court allowed Mr. Maumau to testify about the circumstances surrounding his preparation of the Exit Plan, including his understanding about whether and why he felt obligated to make the statements in the Exit Plan. The court heard argument on the issues and directed the

parties to file briefs by the end of the following week (i.e., by approximately August 26, 2011), with argument addressing the new issue.[1] The United States filed a brief (see Gov't's Response to Def. Maumau's Mot. to Suppress Evid. (Docket No. 807)), but Mr. Maumau has not filed any further pleading on the matter.

Because the circumstances surrounding Mr. Maumau's preparation of the Exit Plan did not implicate his Fifth Amendment rights, the court DENIES Mr. Maumau's motion to suppress.

**FINDINGS OF FACT**

Defendant Kepa Maumau was committed to the Wasatch Youth Center in 2005 by a Juvenile Court Judge of Utah's Third District Court. In Utah, the Youth Parole Authority (YPA) uses facts and circumstances surrounding the youth's offense to establish the suggested number of months a youth will serve in the facility. But the youth is not sentenced to a specific length of incarceration. Instead, the length of confinement is based on the guidelines the YPA establishes, and the YPA regularly reviews the juvenile's progress to determine when to release him.

When deciding whether to release the youth, the YPA considers whether he has served the time recommended by the YPA, whether he has completed an individual treatment plan with positive ratings, and whether he has demonstrated a readiness for release. Although an exit plan may be written by a youth nearing a parole date, the YPA does not require an exit plan before granting release (although occasionally exit plans will be mentioned in a parole review). The contents and circumstances surrounding the creation of an exit plan vary depending on the individual facility where the youth was committed.

---

[1] This matter was expedited because trial is scheduled to begin Tuesday, September 6, 2011.

In Mr. Maumau's situation, at the behest of his counselor at the Wasatch Youth Center, he wrote the Exit Plan in 2006. (See Gov't's Sealed Ex. A).[2] No one explained Mr. Maumau's Miranda rights to him before he wrote the Exit Plan.

His exit plan contained an "offense report," in which he detailed his gang involvement. But it also included a schedule for his days after release as well as personal statements describing his progress in treatment and his goals for the future. Despite Mr. Maumau's stated belief on the stand that he felt he had to write the Exit Plan, it was not required as a condition of his release.

## CONCLUSIONS OF LAW

**A.     The exit plan does not implicate Fifth Amendment protections.**

Because Mr. Maumau was not subject to express questioning or its functional equivalent, he was not entitled to a Miranda warning. The Supreme Court held in Miranda v. Arizona that in the context of "custodial interrogation" certain procedural safeguards are necessary to protect a defendant's Fifth and Fourteenth Amendment privilege against compulsory self-incrimination. Miranda v. Arizona, 384 U.S. 436, 444 (1966). In Miranda, the Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. The Court later expanded this definition in Rhode Island v. Innis to include "not only . . . express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

---

[2]The exit plan was recovered by police during a search not challenged here.

Mr. Maumau was not subjected to express questioning or its functional equivalent. Although he was in custody, he developed the exit plan independently as part of a rehabilitation program, not as a result of intensive questioning designed to extract incriminating information. Accordingly, he was not entitled to a <u>Miranda</u> warning and his constitutional rights were not violated.

**B.     The exit plan was not obtained under coercive circumstances.**

Looking at the totality of the circumstances, the statements in Mr. Maumau's exit plan were not coerced. For a confession to be admissible "it must be made freely and voluntarily; it must not be extracted by threats in violation of due process or obtained by compulsion or inducement of any sort." <u>Clanton v. Cooper</u>, 129 F.3d 1147, 1158 (10th Cir. 1997) (internal quotation marks and citations omitted). To determine whether a confession was made freely and voluntarily, the court considers the totality of the circumstances, including: "(1) the defendant's age, intelligence, and education; (2) the length of the detention and interrogation; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to or threatened with any physical punishment." <u>United States v. Williams</u>, 576 F.3d 1149, 1162 (10th Cir. 2009) (citing <u>United States v. Lugo</u>, 170 F.3d 996, 1004 (10th Cir. 1999)).

Although age may be a pressing factor in the context of police interrogations, the Exit Plan was not created in an atmosphere of traditional interrogation, nor was Mr. Maumau subjected to or threatened with any physical punishment. Mr. Maumau was 17 years old, and had already been convicted and sentenced when the exit plan was created and was participating in the Wasatch Youth Center's rehabilitation program by attending group counseling sessions. There is

nothing in the record to suggest that the exit plan was improperly coerced or involuntary based on the five factors enumerated above.

The consequences for refusing to write an exit plan did not amount to coercion. For example, in McKune v. Lile, the Supreme Court held that the adverse consequences faced by a prisoner for refusing to make admissions required for participation in a rehabilitation program were not so severe as to amount to compelled self-incrimination. 536 U.S. 24, 37-38 (2002). In the context of prison rehabilitation programs, the Tenth Circuit has repeatedly held that consequences associated with refusals to participate have not been so severe as to constitute compulsion. See Searcy v. Simmons, 299 F.3d 1220 (10th Cir. 2002); Gwinn v. Awmiller, 354 F.3d 1211 (10th Cir. 2004); Wirsching v. Colorado, 360 F.3d 1191 (10th Cir. 2004).

In Searcy, the consequences for non-participation resulted in the withholding of good time credits, something the court found that Searcy had no constitutional right to receive. Id. at 1226. The court did not characterize the withholding as a penalty but rather as "the withholding of a benefit that the [Department of Corrections] is under no obligation to give." Id. In Gwinn, the consequences for non-participation were similar, resulting in the loss of eligibility to receive good time credits at a higher rate. Id. at 1225.

In Wirsching, the Tenth Circuit deferred to the judgment of prison administrators and held that limitations on the prisoner's visitation rights were necessary for successful rehabilitation. Id. at 1200. Because the Tenth Circuit accords "substantial deference" to prison administrators to "determin[e] the most appropriate means to accomplish [the legitimate goals of a corrections system]," the burden is on the prisoner to disprove the validity of challenged regulations. Id.

Mr. Maumau initially argued that were he to have refused to complete the Exit Plan, he would have "only increased the period of his incarceration." (Def.'s Mot. to Suppress Evid. at 5.) At the hearing, he conceded that this was not the case. But even if it were, this consequence is not one that the Supreme Court or Tenth Circuit has recognized as being clearly coercive. Rather, an increase in the period of incarceration is more similar to withholding good-time credits and therefore does not constitute compulsion under Tenth Circuit precedent. Moreover, because there is a rational relationship between the completion of an exit plan and the release of a juvenile offender (reducing recidivism) and because the Tenth Circuit is substantially deferential to the interests of prison administrators, the court finds that Mr. Maumau's statements in the Exit Plan were not coerced and Mr. Maumau's Fifth Amendment rights were not violated.

## ORDER

For the foregoing reasons, Kepa Maumau's Motion to Suppress Evidence (Docket No. 624) is DENIED.

DATED this 6th day of September, 2011.

BY THE COURT:

*Tena Campbell*
TENA CAMPBELL
U.S. District Court Judge