JOHN W. HUBER, United States Attorney (7229)
RYAN D. TENNEY, Assistant United States Attorney (9866)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 325-3256

_____

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | UNITED STATES' OPPOSITION TO MOTION TO REDUCE SENTENCE PURSUANT TO |
| Plaintiff, | : | 18 U.S.C. § 3582(c)(1)(A)(i) |
| vs. | : | |
| | : | Case No. 2:08-CR-00758 TC |
| KEPA MAUMAU, | | |
| Defendant. | : | Honorable Tena Campbell |

_____

In his motion, Kepa Maumau is asking this Court to take 44 years off of his 55-year sentence.   But Maumau's sentence was not a discretionary one. Rather, because a jury convicted Maumau of multiple § 924(c) violations, Maumau was subject to a congressionally-mandated sentence of at least 55 years in prison.   Notably, the Tenth Circuit has held that this very sentencing scheme is both constitutional and binding on the district courts, and Congress has recently declined to make any changes to that sentencing scheme retroactively applicable to defendants (like Maumau) who were sentenced before 2018.

Despite this, Maumau claims that this Court can let him out of prison 44 years early under the terms of 18 U.S.C. § 3582(c)(1)(A)(i).   That section is commonly referred to as the "compassionate release statute."[1]

But the compassionate release statute is not a plenary resentencing statute.   Instead, under its stated terms, a district court is only authorized to release a defendant early if doing so would be "consistent with applicable policy statements issued by the Sentencing Commission."   In his motion, however, Maumau does not even claim (let alone demonstrate) that releasing him now is consistent with any portion of the Commission's policy statement. Maumau is therefore statutorily ineligible for release under the plain language of the only statute that he relies on in his motion.

Moreover, Maumau's request does not just violate the statute's text.   If accepted and then applied to other cases, his interpretation of this statute would upend the carefully calibrated federal sentencing system that currently exists.

For the reasons set forth below, Maumau's request must be denied.

---

[1] *See, e.g., Rodriguez-Aguirre v. Hudgins*, 739 F. App'x 489, 490 (10th Cir. 2018) (unpublished); *United States v. Lopez-Pastrana*, 889 F.3d 13, 23 n.7 (1st Cir. 2018); *Totaro v. Warden Fort Dix FCI*, 742 F. App'x 596, 597 (3d Cir. 2018) (unpublished); *Crowe v. United States*, 430 F. App'x 484, 484 (6th Cir. 2011) (unpublished); *United States v. Cochran*, 784 F. App'x 960, 962 (7th Cir. 2019) (unpublished).

## ARGUMENT

Under 18 U.S.C. § 3582(c)(1)(A)(i), a court may "reduce" a defendant's "term of imprisonment" "after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that -- (i) extraordinary and compelling reasons warrant such a reduction," and if it also "finds" that the "reduction is consistent with applicable policy statements issued by the Sentencing Commission."

This Court should deny Maumau's request for compassionate release for either of two reasons.

First, under current and still-controlling law, Congress has tasked the Sentencing Commission, not the courts, with determining what constitutes an "extraordinary and compelling reason" that can justify compassionate release.   Notably, the reasons given by Maumau in his motion do not align with any of the reasons given by the Commission.   This statute therefore does not authorize Maumau's early release.

Second, even when "extraordinary and compelling reasons" do exist, the statute also directs a court to consider whether compassionate release is warranted under the 3553(a) factors.   Maumau is an unusually poor candidate for release under those factors.   Maumau committed several violent crimes, he has repeatedly violated prison rules and been involved in

several fights since being incarcerated, and he has served only a fraction of his required sentence.   Even under the 3553(a) portion of the analysis, Maumau's request should be denied.

**I.      There is no "extraordinary and compelling reason" that justifies granting Maumau compassionate release.**

> **A. The Sentencing Commission has power to determine what constitutes an "extraordinary and compelling reason," and Maumau's proffered reasons do not align with any of the reasons given by the Commission.**

As noted, the compassionate release statute allows a court to release a defendant only if it "finds that -- (i) extraordinary and compelling reasons warrant" reducing the defendant's sentence.   18 U.S.C. § 3582(c)(1)(A)(i).

The question here is what constitutes an "extraordinary and compelling reason" for purpose of this statute.   The answer initially turns on *who* is allowed to define this term.   Under controlling law, Congress has empowered the Sentencing Commission, not the district courts, to determine what constitutes an "extraordinary and compelling reason."

Congress has done so in two interlocking statutes.

First, in 28 U.S.C. § 994(a)(2)(C), Congress directed the Sentencing Commission to "promulgate and distribute to all courts" "general policy statements" regarding "the appropriate use" of "the sentence modification provisions set forth" in the compassionate release statute.   Then, in 28

4

U.S.C. § 994(t), Congress stated that the Commission, through its "general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A)," "shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."

Second, the compassionate release statute itself requires a district court to find that there are "extraordinary and compelling reasons" for release.   Notably, the statute specifically requires the district court to find that the "reduction is consistent with applicable policy statements issued by the Sentencing Commission."   18 U.S.C. § 3582(c)(1)(A).

Thus, by direct congressional mandate, the Sentencing Commission's policy statement sets the parameters for any determination of whether a defendant's proffered reasons qualify as "extraordinary and compelling reasons," and compassionate release is only authorized if the court makes the initial predicate finding that release is consistent with that policy statement.

Maumau's request is not consistent with the Commission's policy statement.   That statement is set forth in USSG § 1B1.13.   Echoing the compassionate release statute, § 1B1.13 states that a court may "reduce a term of imprisonment" "if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines" that

5

(1) "Extraordinary and compelling reasons warrant the reduction," (2) the "defendant is not a danger to the safety of any other person or to the community," and (3) the "reduction is consistent with this policy statement." USSG § 1B1.13.

In the commentary, the Commission then states that "extraordinary and compelling reasons exist under any of the circumstances set forth below." USSG § 1B1.13, Commentary, Note 1; *cf. United States v. Nacchio*, 573 F.3d 1062, 1066-67 (10th Cir. 2009) (commentary in the Guidelines "is authoritative" and "given controlling weight" unless "it violates the Constitution or a federal statute, or is inconsistent with[ ] or a plainly erroneous reading" of the relevant Guideline).

The Commission lists four circumstances that would qualify as an "extraordinary and compelling reason" for compassionate release:

- (A): "Medical Condition of the Defendant," which includes a "terminal illness" or "serious physical or medical condition" that "substantially diminishes the ability of the defendant to provide self-care" from prison;

- (B) "Age of the Defendant," which applies when a defendant "is at least 65 years old" and is "experiencing a serious deterioration in physical or mental health because of the aging process";

- (C) "Family Circumstances," which include the "death or incapacitation of the caregiver of the defendant's minor child" or of "the defendant's spouse" when "the defendant would be the only available caregiver";

and

- (D) "Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."

USSG § 1B1.13, Commentary, Note 1(A)-(D).

In his motion, Maumau does not claim that any of these circumstances exist here. *See generally Maumau Mot.* at 6-11.   He doesn't claim to have any "terminal illness" or "serious physical or medical condition" that interferes with his ability to provide self-care.   He's not "at least 65 years old," and he does not claim that he's "experiencing a serious deterioration in physical or mental health because of the aging process."   He doesn't claim that a spouse has died or become incapacitated.   And the "Director of the Bureau of Prisons" has never determined that any other extraordinary and compelling reason exists for granting him early release.

This Court must accordingly deny Maumau's motion.   Again, the current statute only authorizes early release if this Court "finds" that it would be "consistent with applicable policy statements issued by the Sentencing Commission."   18 U.S.C. § 3582(c)(1)(A).   In that policy statement, the Commission has offered four circumstances that qualify.   By

7

his own account, Maumau does not satisfy any of them.   His motion must

therefore be denied for this reason alone.[2]

> **B. The First Step Act did not empower this Court to ignore the Sentencing Commission's policy statement and come up with reasons on its own that would justify compassionate release.**

Despite the clear language from both the compassionate release statute

and § 994(t), Maumau claims that this Court is not actually bound by the

reasons given in the Sentencing Commission's policy statement.   Instead,

Maumau claims that, after the First Step Act, a court can decide for itself

---

[2] In his motion, Maumau suggests that, despite the above, the Commission's policy statement is not binding because the Guidelines themselves are only advisory under *Booker*.   *Maumau Mot.* at 8.

This argument fails as a matter of plain statutory interpretation. Again, in both § 994(t) and § 3582(c)(1)(A), Congress unequivocally granted authority to the Commission to determine the meaning of this term. Maumau does not argue that this scheme is unconstitutional.   Thus, even after *Booker*, the statutes themselves show that the Commission's policy statement is binding.

This argument also fails under *Dillon v. United States*, 560 U.S. 817 (2010).   *Dillon* concerned a motion for a reduction in sentence under 18 U.S.C. § 3582(c)(2), which allows a sentence reduction if it would be "consistent with applicable policy statements issued by the Sentencing Commission" – language identical to that which appears in Section 3582(c)(1)(A) with respect to a compassionate release motion.   *Dillon* held that, even after *Booker,* the Commission's pertinent policy statement concerning retroactive Guideline amendments (USSG § 1B1.10) was binding. *Dillon*, 560 U.S. at 826.   The same is true here too.

what constitutes an "extraordinary and compelling reason." *Maumau Mot.* at 6-11.   Maumau is mistaken.

The First Step Act was signed into law on December 21, 2018.   *See* Congressional Research Service, *The First Step Act of 2018: An Overview* at *1.[3]   The First Step Act had several components, one of which was a series of "sentencing reform[s] that involved changes to penalties for some federal offenses."   *Id.*

As part of these sentencing reforms, the First Step Act changed one portion of the compassionate release statute.   Before, the statute only allowed the Bureau of Prisons to file a compassionate release motion.   The First Step Act changed this, now permitting a defendant to file a motion himself after he "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."   18 U.S.C. § 3582(c)(1)(A).

Maumau claims that he has asked the Bureau of Prisons to file such a motion, and he also claims that he filed this motion more than 30 days after the warden received his request.   *Maumau Mot.* at 4-5.   The United States

---

[3] This report is available at https://crsreports.congress.gov/product/pdf/R/R45558 (last accessed December 16, 2019).

does not dispute this.   Thus, the United States also does not dispute that under the First Step Act, Maumau is authorized to file this motion.

But being authorized to *file* a motion is different than actually being entitled to prevail on it.   As discussed above, Maumau is only entitled to early release under this statute if this Court finds that "extraordinary and compelling reasons" exist and that the "reduction is consistent with applicable policy statements issued by the Sentencing Commission."   18 U.S.C. § 3582(c)(1)(A).   Those are the standards that Maumau must satisfy.

Despite this clear statutory requirement, Maumau nevertheless claims that this Court is not actually required to find that his release is consistent with the Commission's policy statement.   According to Maumau, when the First Step Act changed the compassionate release statute to allow a defendant to file a motion himself, this change also meant, by implication, that district courts can now disregard the Commission's policy statement and come up with reasons on their own.   *Maumau Mot.* at 6-11.   And to be clear, some federal district courts have accepted this argument.   *See, e.g., United States v. Beck*, 2019 WL 2716505 (M.D.N.C. June 28, 2019); *United States v. Cantu-Rivera*, 2019 WL 2578272 (S.D. Tex. June 24, 2019); *United States v. Cantu*, 2019 WL 2498923 (S.D. Tex. June 17, 2019).

10

But many others have not.   Those courts have held that, even after the First Step Act, the Sentencing Commission's policy statement still defines the parameters of the "extraordinary and compelling reasons" that would justify compassionate release.   *See, e.g., United States v. Willingham,* 2019 WL 6733028, *1-3 (S.D. Ga. Dec. 10, 2019); *United States v. Lynn*, 2019 WL 3805349, *1-5 (S.D. Ala. Aug. 13, 2019); *United States v. York*, 2019 WL 3241166, *4 (E.D. Tenn. July 18, 2019); *United States v. Willis*, 382 F. Supp.3d 1185, 1187 (D.N.M. 2019); *United States v. Shields,* 2019 WL 2359231, *4 (N.D. Cal. June 4, 2019); *United States v. McGraw*, 2019 WL 2059488, *2 (S.D. Ind. May 9, 2019).

As a matter of statutory interpretation, these latter courts are correct. Although Congress changed many provisions in many statutes as part of the First Step Act, Congress did not remove or alter the provision in the compassionate release statute that specifically requires a court to find that reducing the defendant's sentence would be "consistent with applicable policy statements issued by the Sentencing Commission."   18 U.S.C. § 3582(c)(1)(A).   That requirement is still there.   Congress also did not remove or alter § 994(t), which still states that the Sentencing Commission "shall describe what should be considered extraordinary and compelling

11

reasons for sentence reduction, including the criteria to be applied and a list of specific examples."

Instead, the "only change" that the First Step Act made to the compassionate release statute was to "allow a defendant to file a compassionate release motion under certain circumstances." *Lynn*, 2019 WL 3805349 at *2. But "[a]side from allowing prisoners to bring a motion directly," the First Step Act did not "change the standards for compassionate release." *Willis*, 382 F. Supp. 3d at 1187.

Maumau's argument thus fails as a straightforward matter of statutory interpretation. If Congress had wanted to change the substantive criteria for compassionate release, or if it had instead wanted to change the scheme under which it is the Commission that defines this term, Congress could have done so. It didn't.

Courts routinely derive meaning from both congressional action and congressional inaction. As explained by the Tenth Circuit, Congress "knows exactly how to alter traditional sentencing practices when it wishes," and when Congress intends to make a particular change, "it does so in ways and places clear enough for all to see." *United States v. Smith*, 756 F.3d 1179, 1185 (10th Cir. 2014). By contrast, when "Congress has been on notice" of a particular "issue for many years" and yet still "declined to modify" the statute

12

at issue, a court may acknowledge the obvious: Congress meant to leave the unaffected provision in place.   *Id.* at 1187.

Here, Congress made a limited change that allowed a defendant to file a motion for compassionate release directly.   But there "is no reason to believe" that the "identity of the movant (either the defendant or the BOP) should have any impact on the factors the Court should consider" when deciding the motion.   *McGraw*, 2019 WL 2059488 at *2; *accord York*, 2019 WL 3241166 at *4.   Nor is it "easy to believe that Congress, which plainly desired the Commission to pour content into 'extraordinary and compelling reasons,' intended to eliminate that content by allowing defendants to move for compassionate release."   *Lynn,* 2019 WL 3805349 at *4 n.5.

Instead, even after the First Step Act, Congress has "left the task of fleshing out the universe of extraordinary and compelling reasons to the Commission, not the judiciary.   The Court is not freed by congressional silence but bound by Commission policy statements that Congress has expressly required the courts to follow."   *Id.* at *5.   Even now, the Commission's policy statement still has "continued authority" to determine what constitutes a reason for compassionate release.   *United States v. Washington*, 2019 WL 6220984, *2 (E.D. Ky. Nov. 21, 2019).

13

Maumau offers several arguments to the contrary, but none of them have merit.

First, Maumau notes that one particular portion of the policy statement is no longer operative. *Maumau Mot.* at 9. And this is true. The Commission's policy statement was written before the First Step Act, and, consistent with the prior version of the statute, Note 4 to the policy statement still states that only the Director of the Bureau of Prisons can file a motion for compassionate release. USSG § 1B1.13, Commentary, Note 4.

Since this particular part of the note directly conflicts with the current language of the compassionate release statute, it is no longer operative. *See Lynn*, 2019 WL 3805349 at *4. But contrary to Maumau's assertion, this does not mean that the rest of the policy statement is also inoperative. Courts commonly invalidate single provisions within a statute without invalidating the entire statute. This is the basic premise of severability doctrine.

Here, while this one portion of Note 4 is incompatible with the current statute, the rest of the Commission's policy statement—including, notably, its definition of "extraordinary and compelling reasons"—is not incompatible with any statute. Because of this, that definition still governs this question as required by the directives set forth in § 3582 and § 994(t).

14

Second, Maumau refers to language from the policy statement's note that states that a "court is in a unique position to determine whether the circumstances warrant a reduction."   *Maumau Mot.* at 9.   But this language, too, does not empower a court to disregard the policy statement.

The full quote from the applicable note reads as follows:

> A reduction under this policy statement may be granted only upon motion by the Director of the Bureau of Prisons pursuant to 18 U.S.C. § 3582(c)(1)(A). The Commission encourages the Director of the Bureau of Prisons to file such a motion *if the defendant meets any of the circumstances set forth in Application Note 1*.   The court is in a unique position to determine whether the circumstances warrant a reduction (and, if so, the amount of reduction), *after considering the factors set forth in 18 U.S.C. § 3553(a)* and *the criteria set forth in this policy statement*, such as the defendant's medical condition, the defendant's family circumstances, and whether the defendant is a danger to the safety of any other person or to the community.

USSG § 1B1.13, Commentary, Note 4 (emphases added).

Read in full, this note does not say that a court is empowered to make up its own criteria that would justify compassionate release.   Instead, this note acknowledges that courts are often better equipped to engage in fact-finding than the Bureau of Prisons, so it encourages the Bureau to err on the side of filing a motion for release.

But as for the substantive determination itself, the note then refers the courts back to the "criteria set forth in this policy statement, such as the

15

defendant's medical condition, the defendant's family circumstances, and whether the defendant is a danger to the safety of any other person or to the community." *Id.* In this sense, the note is directing the Bureau to refer cases to the courts, and it is then directing the courts to continue to do what Congress has always directed them to do: determine whether compassionate release would be "consistent" with the Commission's policy statement. Thus, this note does not undermine the primacy of the policy statement. It actually reinforces it.

Third, citing a Senate Report from the time of the statute's passage, Maumau claims that the compassionate release statute was intended to act as an "alternative review process" that allows a court to revise a sentence that it thinks is substantively unreasonable. *Maumau Mot.* at 6 (citing S. Rep. 98-225). This is not so.

The Senate Report that Maumau relies on was issued in relation to the Comprehensive Crime Control Act of 1984, which was the same statute that created the compassionate release statute. At the time, Congress sought to abolish indeterminate sentencing and the related parole system, based on its belief that fairness required consistent and predictable sentencing of like offenders. The Senate Report thus observed:

16

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment *is justified by changed circumstances*. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term of imprisonment. The Committee believes, however, that it is unnecessary to continue the expensive and cumbersome Parole Commission to deal with the relatively small number of cases in which there may be justification for reducing a term of imprisonment. The bill, as reported, provides instead in proposed 18 U.S.C. 3583(c) *for court determination, subject to consideration of Sentencing Commission standards*, of the question whether there is justification for reducing a term of imprisonment in situations such as those described.

S. Rep. 98-225, at 55-56 (emphases added).

The emphasized portions of this report undermine Maumau's argument.   There, the report itself makes it clear that compassionate release was intended to occur when "justified by *changed circumstances*"—meaning, something that happened after the sentence was imposed.   This is a far cry from Maumau's request, which is largely based on his complaints about the mandatory minimums that were in place at the time of sentencing.

There, the report also emphasizes that the court's determination is "subject to consideration of Sentencing Commission standards."   In this sense too, this report reinforces the central role of the Commission's policy statement in this determination.

17

Indeed, moving beyond that report, the broader legislative history actually shows that Maumau's request is improper, because Maumau's request would upend the carefully calibrated sentencing scheme that Congress created and which has continued to govern federal sentencing ever since.

The 1984 sentencing reform was animated by Congress's determination "that sentencing in the Federal courts is characterized by unwarranted disparity and by uncertainty about the length of time offenders will serve in prison."   S. Rep. 98-225, at 49.   Thus, Congress created the Sentencing Commission and the Guidelines system precisely to "provide certainty and fairness in meeting the purposes of sentencing."   28 U.S.C. § 991(b)(1)(B).

As later explained by Justice Breyer (one of the principle architects of the sentencing reform effort), the old parole system was thus replaced by the Commission-based Guidelines system so as to "create a sentencing system that will require the offender actually to serve most of the sentence the judge imposes."  *Setser v. United States*, 566 U.S. 231, 244 (2012) (Breyer, J., dissenting).   In this sense, the Sentencing Reform Act was designed to "make[ ] all sentences basically determinate."   *Mistretta v. United States*, 488 U.S. 361, 367 (1989).

18

Section 3582 admittedly does allow a court to modify some sentences. But it does so only under carefully delineated circumstances.   Specifically, Section 3582(c) prohibits a court from modifying a sentence of imprisonment unless: (1) extraordinary and compelling reasons warrant a reduction, § 3582(c)(1)(A); (2) another statute or Federal Rule of Criminal Procedure 35 expressly permits a sentence modification, § 3582(c)(1)(B); or (3) a defendant has been sentenced to a term of imprisonment based on a sentencing range that was subsequently lowered by the Commission and certain other requirements are met, § 3582(c)(2).

In his motion, Maumau is trying to expand the first category, claiming that it allows a court to reduce a sentence based on concerns about the sentence's substantive length.   If this were possible, however, this would mark a profound alteration of the sentencing scheme carefully designed by Congress.   It would afford individual judges the authority to, in effect, exercise a parole power that Congress specifically acted in 1984 to abolish, or exercise a clemency function that the Constitution affords exclusively to the President. *See* U.S. Const., Art. II, § 2, cl. 1.   A judge could, for instance, impose a mandatory sentence as dictated by Congress, and then after the judgment became final, act to reduce it upon a declaration that imposition of the sentence in the particular case is "extraordinary" and unwarranted.

19

This power would inevitably result in varying determinations by different courts.   This would remove the certainty and consistency that marks the current system, instead replacing them with uncertainty and inconsistency.

The bottom line is this: even after the First Step Act, the current statute still expressly states that compassionate release is only authorized if it would be consistent with the Sentencing Commission's policy statement. Maumau has offered no reason for releasing him here that would constitute an "extraordinary and compelling reason" under the terms set forth in that policy statement.   Because he offers no basis for this Court to make the required predicate finding, his request must be denied.

> ### C. Even if this Court can determine for itself what constitutes an "extraordinary and compelling reason" for compassionate release, Maumau's proffered reasons still do not suffice.

Even if this Court concludes that the First Step Act empowered it to decide for itself what constitutes an "extraordinary and compelling reason," this does not mean that this Court is left unmoored in making that determination.   Instead, even when courts have accepted this expansive view, they have commonly held that "the Commission's existing policy statement" still serves as "helpful guidance on the factors that support

20

compassionate release." *United States v. Fox*, 2019 WL 3046086, *3 (D. Me. July 11, 2019); *accord United States v. Weidenhamer*, 2019 WL 6050264, *4 (D. Ariz. Nov. 8, 2019); *United States v. Bucci*, 2019 WL 5075964, *1 (D. Mass. Sept. 16, 2019); *Beck*, 2019 WL 2716505, at *7.

Thus, even under this view, courts still "universally turn[ ] to" the Commission's policy statement "to provide guidance" on the appropriate criteria. *McGraw*, 2019 WL 2059488 at *2; *accord York*, 2019 WL 3241166 at *4. And courts grant compassionate release only for reasons that are "comparable or analogous to what the Commission has already articulated as criteria for compassionate release." *Fox,* 2019 WL 3046086 at *3.

Again, the applicable policy statement limits compassionate release to situations involving age, illness, or extreme family circumstances, or instead to cases in which the Director of the Bureau of Prisons has specifically authorized release. USSG § 1B1.13, Commentary, Note 1(A)-(D). In this sense, these categories "form the heartland of compassionate release cases." *United States v. Brown*, 2019 WL 4942051, *4 (S.D. Iowa Oct. 8, 2019).

And again, Maumau does not even claim that he meets any of those categories. He's not old, he's not sick or dying, he doesn't have a spouse who has died or become incapacitated, and the Director of the Bureau of Prisons has never authorized his early release.

21

Instead, the reasons he offers in his motion largely have to do with his character and rehabilitative prospects, as well as complaints about his sentence length.   But as discussed in more detail below, those arguments are more naturally tied to the 3553(a) factors.   This is significant, because the compassionate release statute requires a court to separately consider whether (i) "extraordinary and compelling reasons" justify release and (ii) whether release is warranted under the 3553(a) factors.

If Congress had wanted to combine the two, it could have.   Congress could have simply said that early release is warranted for "extraordinary and compelling reasons," or it could have simply said that early release is warranted if justified under the 3553(a) factors.   But Congress instead treated these as separate determinations, thereby suggesting that they involve separate criteria.

Indeed, the separate nature of these inquiries is reflected in the Commission's policy statement itself.   The statement does not define "extraordinary and compelling reasons" in terms of the defendant's crime or past history.   Instead, it defines "extraordinary and compelling reasons" in reference to the defendant's age, or illness, or the incapacitation of his spouse.   In this sense, the policy statement is targeted at specific factors that

22

go beyond the traditional 3553(a) analysis and are comfortably described as "extraordinary" factors that would warrant compassionate release.

Because of this, even when courts have embraced Maumau's view of how the compassionate release statute works after the First Step Act, those courts have still limited their "extraordinary and compelling reasons" analysis to reasons that are analogous to the categories set forth in the Commission's policy statement.

Take *Cantu,* a case that Maumau cites on pages 5, 9, and 10 of his motion.   The court there granted compassionate release to a defendant who was "an eligible elderly offender," thus satisfying the age criterion from the policy statement.   *Cantu*, 2019 WL 2498923 at *2.   Or take *Beck*, a case that Maumau cites on page 10 of his motion.   The district court there granted compassionate release to a prisoner who had "invasive breast cancer" and was "in urgent need of appropriate treatment to prevent the further spread of her disease and the potential loss of her life," thus satisfying the policy statement's reference to a "terminal illness" or "serious physical or medical condition."   *Beck,* 2019 WL 2716505 at *7.   Or take *Cantu-Rivera*, a case that Maumau cites on pages 5, 9, 10, 11, 13, and 14 of his motion.   The court there granted compassionate release to a defendant who was elderly and suffered from "limitations that age now place[d] on [his] physical abilities,"

23

thus satisfying the age criterion from the policy statement.   *Cantu-Rivera*, 2019 WL 2578272 at *2.

Thus, even though those courts concluded that, because of the First Step Act, they now had independent authority to interpret the "extraordinary and compelling reasons" provision from the statute, they still exercised that authority in a manner that was consistent with the Commission's policy statement.

Maumau is asking this Court to do something far different.   He wants this Court to depart wholesale from the Commission's policy statement. Again, Maumau is not old, or sick, or needing to be released so that he can care for an incapacitated spouse.   Instead, he is young and healthy, and he is asking for release largely based on how long his sentence is.

Maumau's reasons therefore do not fit within "the heartland of compassionate release cases" (*Brown*, 2019 WL 4942051 at *4), and his reasons are not at all "comparable or analogous to what the Commission has already articulated as criteria for compassionate release" (*Fox,* 2019 WL 3046086 at *3).   Because of this, even if this Court views the policy statement as mere "guidance," this Court still should not find that "extraordinary and compelling reasons" exist.   Even under this view,

24

Maumau does not offer a reason that is sufficient under this statute.   His motion should be denied.

## II.   The 3553(a) factors also do not support Maumau's request for compassionate release.

As discussed, the statute requires a court to "consider[ ] the factors set forth in section 3553(a) to the extent that they are applicable if it finds that extraordinary and compelling reasons warrant such a reduction."   18 U.S.C. § 3582(c)(1)(A)(i).

The 3553(a) factors require a court to look at a number of different criteria.   The relevant ones here include "the nature and circumstances of the offense and the history and characteristics of the defendant," "the kinds of sentences available," and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   18 U.S.C. § 3553(a)(1), (3), (6).   Even if "extraordinary and compelling reasons" exist, Maumau is an unusually poor candidate for release under those factors.

### A. The nature of the offenses and Maumau's history and characteristics do not support early release.

Under § 3553(a)(1), this Court looks to the "nature and circumstances of the offense and the history and characteristics of the defendant."

25

Maumau was not convicted of minor or non-violent crimes.   Instead, he was convicted of one count of engaging in a racketeering conspiracy, one count of Hobbs Act robbery, three counts of assault with a dangerous weapon in aid of racketeering, and three counts of using a firearm during a crime of violence.   *PSR* at 1.

His ultimate sentence, of course, was driven by the 924(c) convictions. Those convictions were based on three armed robberies that Maumau committed as part of his involvement in TCG.   The details of those crimes are striking.   In the first robbery, Maumau entered a clothing store in Ogden, pointed a handgun at its employees, and said, "'Open the fucking cash register.'"   *PSR* at 9.   In the second, Maumau entered a fast food restaurant in Arizona and, while "pointing" a handgun "at the victim and waiving the gun up and down," told the cashier "to give me all the money.   Hurry up and get it open."   *Id.*   In the third, Maumau entered another fast food restaurant in Arizona, "pulled a handgun out of his waistband from under the front of his shirt," "pointed the handgun at the night manager," and "told the night manager, 'you can open the register or I'll kill you.'"   *Id.* at 10.

Those charges are not the full extent of Maumau's criminal record. The PSR recounts Maumau's fairly extensive juvenile record.   *PSR* at 23-26. And while Maumau now gives himself credit for the fact that his "adult

26

record [is] devoid of any other criminal offenses" beyond these particular convictions (*Maumau Mot.* at 13), this is not as laudatory as he suggests. Maumau was born in October 1987.   *PSR* at 2.   He committed these offenses between January and September 2008, which would have been when he was 21 years old.   *Id.*   He was arrested in December 2009, *id.,* and he has been incarcerated ever since.   So what Maumau is taking credit for is the fact that he was not charged with any crimes during the two years before, and one year after, he committed these three violent robberies.   Going three years without committing a crime is commendable, but it is not grounds for invalidating a lengthy prison sentence that was imposed for committing crimes in the interim.

   This is particularly so given Maumau's conduct since he was incarcerated.   Maumau claims that he has "dedicated himself to becoming a better person during the decade he has spent incarcerated."   *Maumau Mot.* at 12.   His prison record suggests otherwise.

   In the 11 years that Maumau has been incarcerated, he has committed 10 disciplinary infractions.   *See* Attachment A.[4]   This includes one instance in which he possessed heroin inside the prison, and it includes another in

---

[4] Attachment A is a statement from the Bureau of Prisons setting forth Maumau's disciplinary history since being incarcerated.

which he was cited for possessing unspecified "drugs/alcohol." *Id.* This also includes multiple infractions for "being insolent" or "interfering" with prison staff. *Id.*

Maumau's record also includes three violent incidents. In June 2012, he was cited for "fighting with another person," with the explanation— apparently from Maumau—that "we beat him up, didn't like his charges." *Id.* In June 2014, Maumau "assault[ed]" another inmate. *Id.* And in April 2018, Maumau "admitted to fighting with another inmate." *Id.*

Maumau's involvement with the "Raise Your Pen Coalition" raises further concern. In correspondence with this Court, Maumau's counsel suggested that this is a charitable foundation aimed at helping wayward youth. *See* Attachment B. But the coalition's Facebook page suggests that it is directed at a different purpose. As shown in the attached screenshots, this "coalition" appears to be a tribute to Siale Angilau, who was one of Maumau's fellow TCG members. *See* Attachment C.

As this Court is well aware, a U.S. Marshal shot and killed Angilau during Angilau's federal trial. This shooting occurred when Angilau grabbed and "raised a pen" from his counsel's table and then charged and attacked a government witness who was testifying against him.

28

If Maumau wished to simply honor his friend's life, there would be many appropriate ways to do so. What Maumua has chosen to do, however, is actively participate in a group that decided to name itself not after Angilau's life in general, but instead after the precise moment in which he attacked a cooperating witness in federal court. Indeed, the attached posts from the coalition's Facebook page make it clear that this act—and the shooting that followed—is a substantial part of this group's focus. Those posts include repeated calls for "Justice" for Angilau, with one post even demanding that "there really can be no Peace without Justice." *Id.*

The point here is not to relitigate the traumatic circumstances surrounding Angilau's death. Rather, the point here is that Maumau's continuing support for a group that is named—not after a person, but after a particular moment of violence—at least suggests that Maumau is not as detached from TCG's worldview as he would have this Court believe.

Returning to 3553(a), the relevant factor asks this Court to look to the defendant's crime, as well as his past and current history. Maumau committed many serious federal offenses, all of which involved some combination of gang activity and violence. His conduct before and after these crimes is marked by continued proclivities towards violence and socially disruptive conduct. And even while incarcerated, he has continued

29

to act out—possessing drugs and alcohol, interfering with staff, and fighting with other inmates.   Taken as a whole, this 3553(a) factor therefore weighs strongly against Maumau's request for early release.

## B. The length of Maumau's sentence, its mandatory nature, and the short amount of the sentence that Maumau has served all strongly weigh against releasing him from prison now.

Under § 3553(a)(3), this Court also considers "the kinds of sentences available" for the offense of conviction.   This factor weighs heavily against granting Maumau compassionate release at this time, particularly for the reasons that he offers in his motion.

This Court sentenced Maumau to 55 years in prison, and it did so based on the minimum mandatory sentences that were required by § 924(c) at the time of these offenses.   This sentence was both required and constitutional.

"'Congress has the power to define criminal punishments without giving the courts any sentencing discretion.'"   *United States v. Angelos*, 433 F.3d 738, 754 (10th Cir. 2006) (quoting *Chapman v. United States*, 500 U.S. 453, 467 (1991)).   In *Angelos*, the Tenth Circuit specifically held that § 924(c)'s stacked mandatory minimum sentences were constitutional. *Angelos*, 433 F.3d at 750-54.

Indeed, in a later case, the Tenth Circuit held that even a mandatory minimum sentence of 1495 months under § 924(c) was constitutional.

30

*United States v. Jolley*, 275 F. App'x 758, 759-63 (10th Cir. 2008) (unpublished).   The Tenth Circuit explained that in its view, the "lengthy sentences mandated by Congress in § 924(c) are an entirely rational response" to the "exceptional danger" posed by the combination of firearms and drug offenses.   *Id.* at 762.

But what matters here is not just that those sentences were constitutional.   What really matters is that they were mandatory.   In a published opinion that was written by then-Judge Gorsuch, the Tenth Circuit stressed that a § 924(c) sentence is "indeed a mandatory minimum sentence." *Smith*, 756 F.3d at 1185.   In the Tenth Circuit's view, § 924(c) "guarantees that—whatever the defendant's sentence for his underlying offense—he will *at least* and *always* serve a certain number of years for his gun crime."   *Id.* (emphasis in original).   "Put differently, § 924(c)(1)(A) serves to ensure sentences for gun use are indeed mandatory and minimum ones."   *Id.*

The United States is, of course, cognizant of this Court's stated concerns about the fairness of these sentences as applied to Maumau.   But this motion is not the proper place for Maumau to litigate any substantive concerns about the length of these sentences.   If Maumau believed that his sentence was substantively unreasonable, or instead that his sentence was unlawful or even unconstitutional, Maumau could have raised those

31

arguments on direct appeal.   If that failed, he could have collaterally attacked the length of his sentence through a 2255 petition.

But as a general rule, a 2255 proceeding is "'the only means'" by which a defendant can "'challenge the validity of a federal conviction following the conclusion of direct appeal.'"   *Davis v. English*, 753 F. App'x 635, 637 (10th Cir. 2018) (unpublished) (citation omitted).   If an initial 2255 petition fails, the rules make it difficult for a defendant to file a successive 2255 petition. *See generally* 28 U.S.C. § 2255(h).

This matters here.   As noted, Maumau has already passed through the direct appeal and initial 2255 stages.   He did not prevail in either proceeding.   In this motion, then, he is essentially trying to accomplish the same result that he could have sought there—i.e., to undo his sentence on substantive reasonableness grounds—through the guise of a different kind of motion.   In this sense, what he's really trying to do is convert the compassionate release statute into a third mechanism for invalidating a sentence on substantive reasonableness grounds, thereby allowing him to avoid the restrictions that would be in his way if he tried to raise these arguments in a second or successive 2255 petition.

This cannot be allowed.   Indeed, the Third Circuit recently recognized as much, holding that the compassionate release statute does not "provide for

release on the basis of arguments" that "were or could have been raised on direct appeal or in a § 2255 motion." *United States v. Handerhan*, 2019 WL 4898675, *2 (3d Cir. Oct. 4, 2019) (unpublished). Instead, the court "question[ed] whether an alleged sentencing error that was correctible in prior proceedings could ever be an 'extraordinary and compelling reason' for release under § 3582(c)(1)(A)(i)." *Id.*

Other courts have recognized this as well. In *Willingham,* a federal district court held that the defendant's complaint that her "sentence [was] too harsh, especially as compared to that of" other defendants, did "not even move the needle toward the extraordinary and compelling circumstances that must exist before the Court should grant compassionate release." 2019 WL 6733028 at *2. Instead, the court viewed her arguments as an "attempt to relitigate the propriety of her sentence under the auspice of 'compassionate release,'" an attempt that "falls completely flat." *Id.*

In *Fox,* another district court refused to grant compassionate release based on the perceived harshness of the defendant's sentence. 2019 WL 3046086 at *3. While acknowledging the defendant's "understandable frustration over the unfairness he perceives in others getting sentencing benefits while he does not," the court held that the compassionate release statute "is not an end-run around" "Congress's decision to reduce sentences

33

for some crimes but not others, or a means to redress perceived disparities with other sentenced defendants." *Id.*

Indeed, consider the other systemic consequences that would follow from allowing this kind of motion on the grounds offered by Maumau. As discussed, the First Step Act allows a defendant to personally file a motion for compassionate release 30 days after the warden of his prison receives his request. In theory, a defendant could file such a motion even a short time after he was sentenced. But if a court could then grant compassionate release based on its disagreement with the length of a mandatory sentence, a defendant who was sentenced to mandatory sentence could simply file a motion for compassionate release a short time later, and the district court could then order the defendant's release at a time much earlier than Congress specifically required. In this sense, the compassionate release statute would essentially be turned into a catch-all resentencing statute, one that superseded the mandatory provisions that applied to that sentence.

In this sense, interpreting the compassionate release statute this way would essentially void § 924(c)'s "guarantee" that the defendant would "*at least* and *always* serve a certain number of years" for his crime. *Smith*, 756 F.3d at 1185 (emphasis in original). At that point, the mandatory minimum sentences would cease to be either mandatory or minimum. This cannot be

34

what Congress intended to accomplish when it passed the compassionate release statute.

Contrary to Maumau's claim, *Maumau Mot.* at 10, the fact that Congress amended the § 924(c) stacking provision as part of the First Step Act also does not suggest he's entitled to relief.   If anything, the particular way that Congress did this actually reinforces that Maumau must serve the required sentence.

Congress decides whether a statutory change is retroactive.   *Dorsey v. United States*, 567 U.S. 260, 274 (2012).   In the ordinary course, it is presumed that a change to criminal penalties does not apply retroactively, unless Congress provides otherwise.   *Id.* at 272.   And as a general rule, the "repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide," and, even after a statute is amended, its prior version "shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability."   1 U.S.C. § 109.

This is so here.   In the relevant portion of the First Step Act, Congress established that the changes to the § 924(c) stacking provision "apply to any offense that was committed before the date of enactment of this Act, *if a*

35

*sentence for the offense has not been imposed as of such date of enactment*."
*See* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. at 5222 (emphasis added).   Because of this clear directive, the Tenth Circuit has held that the First Step Act's changes to the § 924(c) sentencing scheme "plainly do[ ] not reach § 924(c)(1)(C) sentences" that "were imposed before the Act was enacted."   *United States v. Hunt*, 2019 WL 5700734, at *3 (10th Cir. Nov. 5, 2019) (unpublished).   Thus, Congress has expressly decided to *not* to make its changes to the stacking provision retroactive, thereby demonstrating a specific congressional intent to leave in place the previous sentences (like Maumau's) that were imposed under the prior "stacking" regime.

Again, returning to the 3553(a) factor itself, that factor looks to the "kind[ ] of sentence available" for this particular defendant.   Here, the only available sentence was one that required 55 years in prison.   At the present time, neither Maumau's conviction nor his sentence have ever been overturned or invalidated, nor have the statutes that specifically required this very sentence.   Thus, even now, this Court is left a very lengthy and expressly *mandatory* sentence.

Maumau has served just 11 years of that sentence.   Whatever it is that the compassionate release statute allows, it surely does not allow a criminal who is young and healthy to be released after serving just 1/5 of a

36

congressionally-mandated sentence.   Given the length of this sentence, its mandatory nature, and the fact that Maumau has served only a small part of it, this factor strongly weighs against release.

### C. The sentence disparities provide no basis for early release.

Finally, under § 3553(a)(6), this Court considers "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

In his motion, Maumau complains about the "glaring unwarranted disparity" between his sentence and those of his fellow gang members who accepted plea bargains.   According to Maumau, this disparity is unfair because it is "based solely on the fact that Maumau elected to exercise his constitutional right to a jury trial." *Maumau Mot.* at 14.

Maumau's focus is misplaced.   Section 3553(a)(6) does not ask a court to consider disparities between individual defendants in an individual case. Instead, it allows a court to consider "'disparities nationwide among defendants with similar records and Guideline calculations.'" *United States v. Lente*, 759 F.3d 1149, 1168 (10th Cir. 2014) (citation omitted).

Moreover, even there, disparate sentences are permissible where the disparities are "'explicable by the facts on the record.'" *Id.* (citation omitted). This is so here.   Contrary to Maumau's claim, the disparities between his

37

sentence and those of his fellow gang members are not the result of Maumau

deciding to *go* to trial.   Rather, the disparities are the result of what

happened next.   At the close of his trial, Maumau was convicted of multiple §

924(c) counts.   By contrast, his co-defendants who pleaded guilty earlier

have never been convicted of multiple § 924(c) counts.

Thus, the disparities that exist are based on differences in the

defendants' individual conviction profiles.   This is appropriate.   If Maumau

"'has subjected himself to a severe penalty, it is simply because he has

committed a great many such offenses.'"   *Jolley*, 275 F. App'x at 759 n.2

(quoting *O'Neil v. Vermont*, 144 U.S. 323, 331 (1892)).

For this reason, the Tenth Circuit has repeatedly "rejected claims of

substantive unreasonableness based on sentencing disparities among

codefendants where one of them had a Rule 11(c)(1)(C) agreement."   *United

States v. Brooks*, 736 F.3d 921, 943 (10th Cir. 2013).   Such differences are

"reasonable," because they account for one defendant's "acceptance of guilt

and the sparing of substantial judicial resources that otherwise would have

been devoted to his trial."   *Id.*

This is also true in the Guidelines context.   "Co-defendants who are

charged with and convicted of different offenses are not 'similarly situated'

with respect to the sentencing guidelines," even where the differing

38

convictions are the result of one defendant accepting a plea.   *United States v. Contreras*, 108 F.3d 1255, 1271-72 (10th Cir. 1997).   Indeed, "a trial judge may not reduce a defendant's sentence on the mere basis that a co-defendant who engaged in similar conduct but agreed to plead guilty to lesser charges received a lighter sentence."   *Id.* at 1272.   Holding otherwise would have adverse consequences on legitimate "judicial economy" concerns, and it might also harm defendants as a whole by "discourag[ing] the government from offering plea bargains in cases involving multiple defendants.'"   *Id.* (citation omitted).

If Congress thinks this is a problem, it could address it.   It hasn't. And more particularly, if Congress wanted to include sentencing disparities as a basis for compassionate release, it could do so.   It hasn't.   Because of this, this Court "may not reduce [Maumau's] sentence on the mere basis that a co-defendant who engaged in similar conduct but agreed to plead guilty to lesser charges received a lighter sentence."   *Id.*   This factor does not support Maumau's request.

* * * * *

A final, aggregate note is in order.   Many of the cases that Maumau relies on in his motion stand in stark contrast to this one.   Indeed, as a

39

points of reference, those cases show how inappropriate it would be to release Maumau for the reasons that he offers in his motion.

Take *Cantu*.   The district court there granted compassionate release to the defendant.   But that defendant had committed a non-violent offense, was elderly at the time of his motion, had "only one minor fighting incident" (which was an act of self-defense) during his entire time in prison, and had already served 14 years of his 15-year sentence.   *Cantu*, 2019 WL 2498923 at *2, 2 n.2, 6-7.

Or take *Beck*.   The district court there granted compassionate release to a prisoner who had been sentenced to 165 months in prison after being convicted of running a meth lab with her husband and possessing a firearm while doing so.   *Beck,* 2019 WL 2716505 at *1.   The court released her after finding that she had been diagnosed with cancer while incarcerated, that the Bureau of Prisons had repeatedly failed to provide her with proper treatment, and that the Bureau's failures had allowed her cancer to spread, thereby endangering her life.   *Id.* at *6-10.

Or take *Cantu-Rivera*.   The court there granted compassionate release to a defendant who had been convicted of drug distribution offenses, where the defendant met "the age-related definition of extraordinary and compelling circumstances" in the compassionate release statute and was "experiencing

40

serious deterioration in physical health because of the aging process."
*Cantu-Rivera*, 2019 WL 2578272 at *1.   But beyond that criterion, the
defendant had "served 30 years in prison," and he also had an "extraordinary
degree of rehabilitation," including "over 4,000 hours of teaching while in
federal prison," "service as a teaching assistant in several prison facilities,"
and "service in the BOP's suicide watch program."   *Id.* at *2.

Maumau's case scarcely resembles those.   Maumau is young and
healthy, not old and infirm.   Maumau is not in prison for drug offenses or
simply possessing a firearm; rather, he's in prison for committing robberies in
which he threatened the lives of several people by pointing a gun at them and
telling them he might kill them.   Maumau is not even at the middle of his
sentence; instead, he is just 11 years into a mandatory sentence of 55 years.
And since being incarcerated, Maumau has repeatedly broken prison rules,
including being involved in three fights.

Whether viewed individually or as a whole, the 3553(a) factors simply
do not support Maumau's request to be let out of prison 44 years earlier than
Congress "guaranteed" he must serve.   Even if this Court finds that

"extraordinary and compelling reasons" exist, it should still deny Maumau's

motion on the basis of the 3553(a) factors.

Respectfully submitted January 9, 2020.

JOHN W. HUBER
United States Attorney


/s/ Ryan D. Tenney
RYAN D. TENNEY
Assistant United States Attorney

42